CALLAN, and husband, Plaintiffs-Respondents, v. PETERS CONSTRUCTION COMPANY, and others, Defendants: NELSON INC. OF WISCONSIN, Defendant-Appellant: MARSHALL FIELD COMPANY, Defendants and Co-Appellants: FROEDERT ENTERPRISES, INC., and another, Defendants-Co-Appellants, and Respondents: INLAND-ROBBINS CONSTRUCTION, INC., and another, Defendants and Co-Appellants.

Court of Appeals

*No. 78–153. Submitted on briefs August 20, 1979.—*
*Decided December 11, 1979.*
(Also reported in 288 N.W.2d 146.)

228

For the appellant the cause was submitted on the brief of *Tom E. Hayes, Edward A. Hannan* and *Hayes and Hayes;* for co-appellant Marshall Field Co. on the brief of *Thomas W. Godfrey* and *Godfrey & Trump;* for co-appellants Froedert Enterprises, Inc., and The Travelers Indemnity Co., on the briefs of *Donald H. Carlson* and *Riordan, Crivello, Sullivan & Carlson;* for co-appellants Inland-Robbins Construction, Inc., and The Home Indemnity Company on the briefs of *James P. Brennan* and *Brennan & Collins,* all of Milwaukee.

For the respondents the cause was submitted on the brief of *James J. Murphy* and *Habush, Gillick, Habush, Davis & Murphy* of Milwaukee.

Before Decker, C.J., Moser, P.J. and Brown, J.

BROWN, J. This is an appeal from an action which was commenced pursuant to the Wisconsin Safe-Place Law, sec. 101.11, Stats. Mary Callan and her husband brought suit after she was injured in a fall near the sidewalk entrance to the Marshall Field store at Mayfair Shopping Center on October 17, 1973. At trial, the various-named defendants were: Froedert Enterprises, Inc. (the owners of the Mayfair Shopping Center); Marshall Field Company (the lessee of premises at Mayfair); Peters Construction Co. (the general contractor hired by Froedert to enclose the mall of the shopping center); Inland-Robbins Construction, Inc. (hired by Marshall Field as general contractor for remodeling Marshall Field's entranceways), and Nelson Incorporated of Wisconsin (employed by Inland-Robbins as mason

subcontractor in connection with remodeling of the entranceways to the Marshall Field store). A jury found all the defendants negligent except for Peters Construction Co. Each of the other defendants found negligent have appealed the verdict.

Mary Callan was on her way into the Marshall Field store when she was injured. Her fall occurred approximately twenty feet from one of the Marshall Field entrances known as "vestibule 5." She testified that she stepped on a wedge-shaped object which appeared to be a piece of concrete block about four to five inches long, irregularly shaped and not unlike the color of the sidewalk. She also testified that she noticed other pieces of concrete block and pebbles surrounding her after her fall. At the time of her fall, workmen were engaged in remodeling the nearby entranceways, known as "vestibule 6" and "vestibule 7." This remodeling project was taking place in conjunction with the larger project of converting the then open-air mall to an enclosed mall. "Vestibules 6 and 7" were at the north end of the central mall enclosure project. The enclosure project was in the last stages of completion at the time of Mary Callan's fall.

No actual renovation was being conducted upon "vestibule 5," the approximate site of Mary Callan's fall. However, construction materials, including cement blocks and other masonry materials, were being stored near and on both sides of "vestibule 5." At the time of the fall, the shopping center, including the Marshall Field store, was open for business. The sidewalk and vestibule, where Mary Callan was walking, was open for use by the public. There were no barricades, warnings or signs of any kind.

The record shows that not only was the concrete material for the renovation project stored at "vestibule 5," but also that debris from the renovation project was being carried past the "vestibule 5" area by wheelbarrow

and deposited in a nearby dumpster. Pieces of debris, from time to time, would fall out of the wheelbarrows and onto the sidewalk area near "vestibule 5."

As a result of her fall, Mary Callan sustained injuries which probably will require a total hip replacement as well as permanent disability. The jury found that Froedert Enterprises, Inc. was 15% negligent. Marshall Field & Company was also 15% negligent. Inland-Robbins Construction Inc. was 30% negligent. Nelson Incorporated was held to be 40% negligent.

Because of the number of defendants involved and because each defendant presents different issues for determination, we will discuss the arguments of each defendant separately. Further facts will be set forth as are necessary to the determination of each defendant's appeal. Facts related will be written in a light most favorable to the jury verdict. *Coryell v. Conn,* 88 Wis.2d 310, 317, 276 N.W.2d 723, 727 (1979).

## FROEDERT-MAYFAIR

Froedert-Mayfair first alleges that it was error to admit evidence of an accident which occurred prior to Mary Callan's fall. Froedert-Mayfair argues that evidence of prior accidents are of little probative value *per se* and, since admission of such prior accidents would allow trial of matters collateral to the factual issue being tried, they are inadmissible in Wisconsin. For support of this contention, Froedert-Mayfair cites *Tiemann v. May,* 235 Wis. 100, 292 N.W. 612 (1940).

Froedert-Mayfair is wrong. Prior accidents are admissible as evidence. In *Netzel v. State Sand & Gravel Co.,* 51 Wis.2d 1, 10 n. 18, 186 N.W.2d 258, 263 n. 18 (1971), the supreme court answered that question by

quoting with approval, in a footnote, the following language in 32 C.J.S. *Evidence* §578 (1964) :

There is no rule of law, however, which prevents the trial of collateral issues, since the objection thereto is purely a practical one, and the general rule is that the admission of evidence of similar acts or occurrences is proof that a particular act was done or that a certain occurrence happened, rests largely in the discretion of the trial court.

*Tiemann v. May, supra,* in no way commands our courts to exclude all evidence of prior accidents. Rather, when the prior accident is of little probative value, the trial judge, in his discretion, may refuse to admit such evidence. It is a decision resting with the trial court's discretion. As stated in *Netzel, supra,* at 10, 186 N.W.2d at 258, 263 n. 17, again in a footnote, quoting with approval 65A C.J.S. *Negligence* §234(1) (1966) :

The true rule would appear to be that the admissibility of evidence of the existence of similar defects, or of the occurrence of other accidents or injuries of a similar nature or similarly caused, depends on the purpose for which the evidence is offered and on whether the nature of the negligence which is claimed to have caused the accident or injury in question is such that proof of other accidents or defects will tend to throw light on the issue; and, where such is the case, evidence of this character is admissible.

Evidence of prior accidents is allowed in the discretion of the trial judge. Both the purpose for which the evidence of other injuries similarly caused and the nature of the negligence claimed are to be considered in determining whether discretion has been abused.

Froedert-Mayfair next contends that, if the evidence of prior accidents is allowed, the trial court abused its discretion because the purpose for which the evidence was intended was faulty and the nature of the prior act was dissimilar to Mary Callan's accident. In deciding wheth-

er the trial court abused its discretion in allowing evidence of the prior accident, we must look to the record to determine the purpose for which the prior-act evidence was offered.

Mary Callan's action against Froedert is based on the allegation that Froedert-Mayfair, as owner, knew or should have known about the unsafe condition of the sidewalk it owned and should have taken steps to protect the people frequenting the shopping center. Therefore, it was incumbent upon Mary Callan to prove that Froedert-Mayfair had notice of the defective condition before Froedert-Mayfair could be held to have been negligent under the safe-place act. To prove notice, evidence was adduced establishing that Froedert had knowledge of a similar fall occurring six days prior to Mary Callan's accident. This prior fall occurred after the masons had gone home, just as in Mary Callan's case. It was argued, by Mary Callan at trial, that Froedert-Mayfair then had an obligation to increase surveillance of the cleaning operation and take remedial action where necessary. She alleged that, after knowledge of the accident, Froedert could have insisted that "vestibule 5" be closed during the construction and could have also insisted that storage of construction materials not be permitted around the "vestibule 5" area.

In this case, it is clear to this court that evidence of a prior accident was necessary to prove notice. We, therefore, hold that the purpose for which this evidence was offered was valid.

Next, we determine whether the nature of the prior act was so probative as to help the jury in its factual determination on the question of notice of was of such little probative value that the admission of such evidence would only serve to confuse and prejudice the jury.

Froedert-Mayfair claims that the prior act was of little probative value. Froedert-Mayfair's analysis is that the prior accident occurred ten to twenty feet away from Mary Callan's accident. It is also argued that the prior accident was caused by slipping on some loose sand, whereas Mary Callan fell on a piece of concrete block. Further, it is claimed that Mary Callan fell during the daylight hours, while the prior accident occurred at night when it was more difficult to see. In addition, Froedert-Mayfair asserts that the prior accident occurred six days before Mary Callan's accident; and, therefore, the temporary, unsafe condition which caused the prior accident was not the same temporary, unsafe condition which caused Mary Callan's accident. The reason for that is because the debris, which might have caused the prior accident, was cleaned up prior to Mary Callan's accident, thus wiping out the existence of the defect and preventing the owner from discovering and remedying the problem. Froedert-Mayfair goes on to argue it cannot be charged with actual or constructive notice of a temporary condition unassociated with the structure when there is no evidence as to the length of time the condition existed.

We are not persuaded by either Froedert-Mayfair's analysis of the facts or logic. First, there is overwhelming evidence that the accidents were similar. Although the prior accident occurred some feet away from Mary Callan's, the victim of the prior accident was still within the "vestibule 5" area and, in fact, was also on her way to "vestibule 5." Both falls took place in the same area which consisted of construction and debris. Further, the prior accident was not caused by slipping on sand as Froedert-Mayfair suggests but, in fact, was a result of stepping on some sort of stone material—like chewed up cement or asphalt. The material was pointy and irregular as was the material which caused Mary Callan to fall. In fact, the victim of the prior accident

specifically stated, on cross-examination, that she did not fall on sand. Additionally, although Mary Callan did fall during the daylight hours, the victim of the prior accident specifically denied having difficulty in seeing. We conclude the accidents were remarkably alike.

Because the accidents were remarkably alike and because Froedert-Mayfair admitted notice of the prior accident, we conclude that Froedert-Mayfair did receive notice of the unsafe condition prior to Mary Callan's fall.

This notice was not extinguished just because the temporary, unsafe condition was cleaned away between the time of the first accident and the second accident. The construction debris was a defect which recurred over a long period of time and was apparent every day. Even if the debris was cleaned up daily, it obviously was not being cleaned up well enough to prevent further injuries. Froedert-Mayfair had a duty to remedy the problem. To theorize if the rubble of the day is gone, the opportunity to take notice of the danger is also gone, is to propound an argument which is contrary to common sense. We feel Froedert-Mayfair should have taken strong measures to either enclose the area or make it safe for frequenters. There is no proof that it did anything, after receiving the notice of the prior accident, to remedy the situation.

As we have concluded that Froedert-Mayfair had notice, we also conclude that this amounted to actual notice and, therefore, the question as to whether Froedert-Mayfair had constructive notice is not relevant.

Froedert-Mayfair's final argument is that there is no basis in law for applying the camouflage instruction as was done in this case. During trial, the defendants claimed that Mary Callan was contributorily negligent because she was not looking where she was going. The defendants alleged that Mary Callan failed to see an object in plain sight. Mary Callan's rebuttal to the allega-

tion was that the concrete debris and the sidewalk were the same color, and the concrete debris had irregular outline. As a result, the object and the concrete tended to blend together thus disturbing her ability to observe and avoid the object which eventually caused her fall. Upon her request, the judge gave a standard instruction on camouflage. The only changes made in the instruction were in the wording and that was in order to fit the facts of the case to the instruction. The instruction, known as Wis J I—Civil, Part I, 1056, is set out below with the changes in parentheses and deletions in brackets as follows:

You are instructed that the color of an object may so blend with the color of the road (sidewalk) that a driver (person) exercising ordinary care as to lookout may not discover the object until it is too late to avoid [a collision with] it. You must determine whether the hole in the road (the object on which Mrs. Callan stepped) did so blend, that is, whether it so blended with the road that a proper lookout would not disclose its presence.

Froedert-Mayfair insists that the instruction is limited to situations involving nighttime motor vehicle accidents and cannot be applied to a situation involving a pedestrian walking on a sidewalk.

We do not agree with Froedert-Mayfair's limitation of the camouflage instruction. Although application of this instruction in the past has involved only nighttime motor vehicle accidents,[1] we consider it as proper anytime the party is accused of failure to see an object in plain sight, as long as there is adequate testimony excusing the failure on the ground that the object blends with its surroundings.

[1] *Pickett v. Travelers Indemnity Co.*, 283 F.2d 835 (7th Cir. 1960); *Gilberg v. Tisdale*, 13 Wis.2d 249, 108 N.W.2d 515 (1961); *Zoellner v. Kaiser*, 237 Wis. 299, 296 N.W. 611 (1941).

The eye is normally an accurate and sensitive receiver.[2] It is the conduit or connecting link between what is really there and what we perceive to be there. When we see an object, our eye gives us immediate information. A picture is seen in the third dimension and is easily evaluated by the brain.[3]

The eye can, however, be deceived. Camouflage is, after all, another word for an illusion.[4] It is possible for the eye to perceive objects differently than they really are. Confusing the eye results from the lack of certain factors of recognition which help the eye and brain identify the object.[5] Although psychologists, military tacticians, scientists and ophthalmologists all have different names for these factors of recognition, they are in agreement that there are six factors generally present. If any one of these factors is absent, an illusion in the process of vision may result. These six factors are as follows:

## 1. *Color*

Color is an aid to the observer when there is a contrast between the color of an object and its background.[6] The greater the contrast in color, the more visible the object appears. While color alone will usually not identify an object, it is often an aid in locating the object or confirming a tentative identification.[7] A secondary consideration is a tone of a color.[8] The tone of color is a modification of color in varying shades. Usually dark-

---

[2] Department of the Army, Department of the Army Field Manual FM 5–20, Camouflage 4 (May, 1968).

[3] *Id.*

[4] M. Luckiesh, Visual Illusions 210 (1965).

[5] Note 2, *supra*, at 3.

[6] Note 2, *supra*, at 9.

[7] Note 2, *supra*, at 9.

[8] Note 2, *supra*, at 9.

er shades of a given color will be less likely to attract an observer's attention than lighter, more brilliant shades.[9] Use of colors that blend in with the surroundings is probably the most basic of the fundamentals of camouflage.[10]

## 2. *Shape*

Experience teaches people to associate an object with its shape or outline.[11] Because shapes have become familiar through experience, the object can be identified long before all its details are identified.[12] When the shapes of solid forms or outlines are not easily identifiable based on past experience, however, the perception, based upon experience and association with objects, is more likely to be in error. The lack of shape identification often gives rise to false assumptions and incorrect associations.[13]

## 3. *Texture*

Texture is the relative smoothness or roughness of a surface. It affects how much light an object reflects or absorbs and whether it appears light or dark.[14] Lack of texture causes shine which is extremely revealing.[15] A rough surface reflects little light and casts many shadows on itself. Consequently, it appears very dark to the eye. A smooth surface reflects more light. This alone can attract attention to a location or to an object. Shine is

[9] Note 2, *supra,* at 9.

[10] Note 2, *supra,* at 9.

[11] Note 2, *supra,* at 8.

[12] Note 2, *supra,* at 8.

[13] Note 2, *supra,* at 8.

[14] United States Army, Training and Doctrine Command, Tradoc Bulletin 6, at 6 (Jan. 30, 1976).

[15] *Id.*

generally associated with the reflection of sunlight from windshields, windows and other such almost textureless surfaces.[16] When an object has a rough surface, the visual sense or intellect may not alert itself to the existence of the object.

## 4. *Movement*

This factor seldom reveals the identity of an object by itself, but it does have importance in revealing the existence of the object.[17] If an object moves, obviously it will attract the attention of the observer just as a shiny object, which lacks texture, will cause attention. If the object is not capable of movement, the attention of the observer to the object must come by other means.

## 5. *Position*

An object is often identified by its position with relation to its surroundings. Position is nothing more than the relative space relationship of one object to another object or objects.[18] A long object on a railroad track, for instance, is often assumed to be a train. Similar objects on a river and parallel to its banks are assumed to be boats or barges. If an object is expected to be present in relation to its surroundings, the observer will be or should be aware that its existence may be imminent.

## 6. *Shadow*

Shadow is principally a projection of shape.[19] It is primarily even more revealing than the object itself. However, if there is no shadow, then the attention of the

[16] Note 2, *supra*, at 8.
[17] Note 2, *supra*, at 9.
[18] Note 2, *supra*, at 8.
[19] Note 2, *supra*, at 8.

observer, if drawn at all, must be drawn by another factor of recognition.[20]

Applying the factors of recognition to the law of camouflage in Wisconsin, we hold that a person who claims to have exercised ordinary care in maintaining a lookout, but nevertheless failed to see an object in plain sight, is not negligent because of failure to see an object in plain sight if the object is not seen because at least one of the factors of recognition was not present thereby causing the object to blend with its background, obscuring its presence and diminishing the reasonable prospect of its perception.

Obviously, the nighttime will present the most usual case for camouflage since factors of recognition are more apt to be absent than during the daytime. We cannot, however, restrict the camouflage instruction to the nighttime since we are convinced that at least one factor of recognition could be missing during a daytime observation, thereby causing a camouflage effect.

We further hold that it is a jury question whether the factors of recognition claimed to be absent provide a valid explanation for a person who professes to have exercised ordinary care in maintaining lookout but, nevertheless, failed to see an object in plain sight.

In this case, the issue of whether Mary Callan failed to see an object in plain sight was squarely before the jury. Mary Callan's testimony that the concrete debris and the sidewalk were of the same color provides evidence that there was no contrast between the object and its background; and, therefore, one of the factors of recognition—color—was absent. Additionally, the shape of the piece of concrete was not well known to her. From

---

[20] Note 4, *supra*, at 215.

the evidence, we would have to say that shape, as a factor of recognition, was absent. Further, the texture of the concrete debris was rough. Thus, the jury could have found that because of the roughness of the texture Mary Callan's attention was not attracted to the debris. Since the object was not movable, the movement factor was also missing. Nor does the evidence show that position or shadow were present. Due to the fact that there was a high quantum of evidence to show none of the factors of recognition were present when Mary Callan fell on the concrete debris, we believe the camouflage instruction was correctly given.

Froedert-Mayfair argues that Mary Callan had been near "vestibule 5" during the construction phase on prior occasions. She should have known through past experience that debris was present. Essentially, this argument is a claim that Mary Callan knew or should have known of the position of the object to its surroundings. Thus, one of the factors of recognition would be present. Having one of the factors of recognition present in the case does not render a camouflage claim ineffective. Rather, if any one of the factors of recognition are not present, then it becomes a jury question as to whether the missing factor of recognition is sufficient explanation for the failure to see an object in plain sight. We, therefore, affirm the trial court with respect to the camouflage issue.

## MARSHALL FIELD

Marshall Field claims that, since it was a mere tenant in the Mayfair Shopping Center, and since the sidewalk is a common area and since it does not have legal title to the sidewalk, it cannot be held liable for any injuries occurring on the sidewalk. Marshall Field disclaims any liability under the safe-place statute and cites provisions

of the safe-place statute which purport to limit an employer's liability under the statute to accidents occurring only on the employer's premises.[21]

Marshall Field admits that the safe-place statute also defines a place of employment as the premises *appurtenant* thereto,[22] but argues that only when an employer has ownership over the appurtenance does liability attach. Since Marshall Field claims that it had no ownership over the sidewalk area, it asserts that there is no liability, as a matter of law, under the safe-place statute.

We disagree with Marshall Field's contentions. In *Schwenn v. Loraine Hotel, Co.*, 14 Wis.2d 601, 607, 111 N.W.2d 495, 498 (1961), it was stated that:

The safe-place statute does not, by its terms, require an employer to own the premises in order to maintain a place of employment. Nor do cases on the subject require ownership as a requisite of liability. Thus, control and custody of the premises need not be exclusive, nor is it necessary to have control for all purposes. [Citations omitted.]

The right to control the sidewalk was not dependent on whether Marshall Field owned the sidewalk. Rather,

---

[21] Marshall Field cites sec. 101.11, Stats., which says: "Every employer shall furnish employment which shall be safe for the employers *therein* and shall furnish a place of employment which shall be safe for the employees *therein*, frequenters *thereof* . . . ." [Emphasis added by Marshall Field.] Also cited is sec. 101.01(2), Stats., which says: "Frequenter means every person other than employee, who may go *in* or be *in* a place of employment or public building . . . ." [Emphasis added by Marshall Field.] Finally, sec. 101.01(2)(i), Stats., is cited referring to an owner as someone: "Having *ownership, control* or *custody* of any place of employment or public building, or the construction, repair, or maintenance of any place of employment or public building or who prepares plans for the construction of any place of employment or public building." [Emphasis added by Marshall Field.]

[22] Sec. 101.01(2), Stats.

liability under the safe-place statute attached if Marshall Field had the right to assume influence over the activities of construction workers using the sidewalk and the right to regulate the movement of pedestrians. Whether an employer has assumed this type of custody and control over the appurtenance is a jury question. *Werner v. Gimbel Brothers, Inc.*, 8 Wis.2d 491, 493–93b, 99 N.W.2d 708, 709 (1959), 100 N.W.2d 920, 921 (1960).

Marshall Field next argues that it had no control whatsoever over the sidewalk area. The record contains substantial evidence from which the jury could conclude that Marshall Field did have a certain amount of control. The construction material was stored around "vestibule 5" in full view of Marshall Field. Marshall Field was aware of the debris. It knew maintenance crews would, from time to time, clean the debris and that the debris accumulated daily. In fact, it was agreed between Froedert-Mayfair and Marshall Field, while remodeling was still going on and prior to Mary Callan's fall, that Marshall Field had a duty to participate in cleaning up the debris. Despite this knowledge, Marshall Field kept the entranceway to "vestibule 5" open to the public, knowing full well that frequenters would be crossing over the debris to enter the store. Marshall Field had notice of an unsafe, temporary condition. Having such notice, it had the right and power to close the sidewalk entranceway to the public. Conversely, it had the authority to participate in cleaning up the debris if it was going to keep the entranceway open. It also had a contractual right to tell its construction contractor to keep construction materials away from the entranceways. Although Marshall Field had a right to change the flow of pedestrian traffic and to control the activities of its contractor for the safety of its frequenters, Marshall Field did nothing. The jury verdict,

finding Marshall Field in violation of the safe-place statute, must stand.

Marshall Field makes one other argument claiming it is entitled to indemnification from Froedert-Mayfair for damages and attorney fees. The argument is without merit. The lease agreement demands indemnification only when Marshall Field is without fault. Since Marshall Field was not without fault, indemnification does not lie.

## INLAND-ROBBINS

Inland-Robbins, the contractor hired by Marshall Field to do the renovation, presents three issues. The first issue is that the rebuttal argument made by plaintiffs' counsel included a personal attack on Inland-Robbins' attorney resulting in an improper influence upon the jury. In particular, plaintiffs' counsel told the jury that Inland-Robbins' lawyer lacked respect for the legal profession and also lacked respect for the jury system. Plaintiffs' counsel argues that his statements were made only as a means of retaliation against disparaging remarks made by Inland-Robbins' lawyer during Inland-Robbins' closing argument. Plaintiffs' counsel points to Inland-Robbins' lawyer's closing argument. Plaintiffs' counsel was accused of dragging the case out longer than it should because he wanted to convince the jury that the case was somehow more important than it really was. We have set both the remarks of Inland-Robbins' lawyer and the responding remarks by plaintiffs' counsel in full in the margin.[23]

---

[23] Defendants' counsel's remarks were as follows:

I think Mr. Murphy has gone about this case in one of the accepted ways as plaintiff's attorneys do their job, and that's this, you take either a small or medium size case and you stretch it out over a long period of time, this is our 10th day in Court on a trip and fall case as we call it. You stretch it out over a long period of time, then 10 days of trial, you call a lot of witnesses

In deciding whether these remarks were prejudicial, we first note that the content of arguments to the jury is a matter resting in the discretion of the trial court. *Fields v. Creek*, 21 Wis.2d 562, 572, 124 N.W.2d 599, 604 (1963). The trial court, in this case, held that the arguments of plaintiffs' counsel were not erroneous and, in any event, were not prejudicial. We agree. We have not only read the final arguments of counsel but the complete transcript. The record is replete with objections and needless rejoinder between the two lawyers. This case was vigorously tried by all sides. It is unfortunate that the extraordinary energy and vigor with which the lawyers conducted the case soon developed into an unduly belligerent attitude on the part of both counsel. We cannot say, however, that the conduct of the lawyers had an impact or effect upon the jury. Inland-Robbins was found 40% negligent, and there was a sufficient amount of evidence by which the jury could base such a finding. Inland-Robbins was the subcontractor and engaged by Marshall Field to demolish and remove the Marshall

it's not really important that all of the witnesses have evidence to offer that bear on the issue of the case you're trying, but you call a lot of witnesses. . . . This is one of the tactics, one of the accepted means that the plaintiff's attorney used in presenting his case to the jury, and they do it for a purpose. And that purpose is this, they want you to think that this [is] a very large case, because if you think it's a very large case, perhaps you will then give a very large verdict, and that will not only increase damages for his client, but that will increase the fee that he gets in the case. . . .

Plaintiffs' counsel's remarks were as follows:

Now last week, the lawyer for Inland-Robbins and Home Insurance Company has asked you to concentrate on the evidence in the case, and I think that's an admirable thing for him to do. But I want you to judge his sincerity when he asked you that by remembering what he said before that, which was to the effect that I had dragged out this trial so as to deceive you into thinking that it was a big case so that I would get a larger fee, that's what he said. Now that's—that indicates several things to me. No. 1,

Field canopy and entranceway. The plaintiffs had alleged Inland-Robbins to be in violation of the safe-place law because it lacked supervision over its own masonry subcontractor, Nelson. It could have ordered Nelson not to store materials on the sidewalk and could have taken steps to inspect the debris and clean it up at the end of the day. The evidence, taken in a view most favorable to the jury verdict, dictates that this was not done. We conclude that the remarks of counsel did not prejudice Inland-Robbins.

In addition to our finding that the jury was not prejudiced by the remarks of counsel, we feel compelled to quote *Sandeen v. Willow River Power Co.*, 214 Wis. 166, 181, 252 N.W. 706, 712 (1934), in which it was said that the conduct of the counsel:

[I]n some instances, may have affected the cause of the counsel by whom it was voiced as unfavorably as it did

the lawyer for the Home Insurance Company lacks respect for the legal profession.

. . .

MR. MURPHY: Just a minute.

MR. BRENNAN: I don't think personal attacks by counsel are appropriate in final arguments. I think that's what he's doing to me right now.

THE COURT: Now Mr. Brennan, I'm sure that's the end of the remarks.

MR. MURPHY: If the Court please, I was—I was—I exactly described what he said, and I am responding to that.

. . .

MR. MURPHY: It shows a lack of the respect for the jury system.

MR. BRENNAN: If the Court please, I will—

THE COURT: Same objection noted.

MR. BRENNAN: Reserve my right to make a motion at the end of the argument.

THE COURT: Correct, you may.

MR. MURPHY: It shows a lack of respect for the truth.

MR. BRENNAN: Same objection, your Honor.

. . .

the cause of the adversary. However, it appears that in most instances there was such provocation for the remarks and argument under review that both must be considered responsible therefor, and hence neither party is in position to avoid the results of the trial on that ground.

We, therefore, determine that Inland-Robbins is not entitled to a new trial on the grounds that plaintiffs' counsel impugned the integrity of Inland-Robbins' lawyer.

Inland-Robbins' second issue is that plaintiffs' counsel said, during closing arguments, that plaintiffs were "forced" to bring their case to trial thereby inferring to the jury that the defendants were obligated to make a good faith effort to settle the case with plaintiffs but did not do so, thus, forcing a trial. We point out, again, that the content of arguments by counsel is a matter resting in the discretion of the trial court. The trial court ruled that any remark of plaintiffs' counsel which commented that the plaintiffs were forced to bring their case into court could not be construed as a suggestion or inference that the defendants were under a duty to settle. The trial court observed that it was obvious to the jury that a settlement had not been reached because there was a real dispute necessitating trial, and each defendant vigorously defended against the claim. The trial court concluded the arguments of plaintiffs' counsel were not erroneous and, in any event, were not prejudicial. We agree with the trial court. We do not read the statement of plaintiffs' counsel as having prejudiced Inland-Robbins.

Inland-Robbins' final contention is that a juror, who was slightly injured in a minor auto accident during the trial, should have been excused, and a mistrial should have been declared. This argument is without merit. The

record convinces this court that the juror was not affected by the accident to the point that she was unable physically or mentally to continue. The trial judge questioned her extensively upon her return to the court. Following his questions, the trial judge then allowed all counsel to *voir dire* the juror. Examination of the *voir dire* testimony reveals no evidence of inability to continue. Additionally, there is no evidence that, just because she was involved in an automobile accident and was injured, she would be inclined to be more partial toward the plaintiffs than she was before her injury. Inland-Robbins argues that the juror had suddenly become biased because she had just been injured, presumably from someone else's negligence. The assumption, without more evidence on the record, is mere speculation. It was within the trial court's discretion not to excuse the juror for cause. *Rodriguez v. Slattery,* 54 Wis.2d 165, 169, 194 N.W.2d 817, 819 (1972) ; *State ex rel. Polk v. Johnson,* 47 Wis.2d 207, 177 N.W.2d 122 (1970). We hold that the trial court did not abuse its discretion.

## NELSON

Nelson, the masonry subcontractor, presents what we intrepret as a sufficiency of evidence issue. First, it is contended that Mary Callan's negligence was greater than Nelson's, as a matter of law. Nelson claims that Mary Callan admitted she had prior knowledge of the construction going on in "vestibule 5." She also admitted she failed to look where she was going and failed to see an object in plain sight. Nelson claims that these facts are contradictory to and inconsistent with other statements she made during the trial. Nelson admits that appellate review is limited to examining the testimony in a light most favorable to the jury verdict, but argues

that we must look at all the testimony of Mary Callan. If her testimony taken as a whole is inconsistent, we must weigh the inconsistencies in Nelson's favor and reverse. That is not the law. We are required only to search for those facts which would support the verdict. In looking for those facts which support the verdict, we are convinced there was a sufficient amount of evidence to find Mary Callan not negligent as a matter of law.

Nelson also claims that there was insufficient evidence pertaining to the impairment of future earning capacity. We note that Mary Callan's earnings were reduced following the accident. There was testimony that her working capacity was reduced. She now walks with a limp and faces an operation which may not take place for several years. Under the circumstances, after reading the record and after having perused evidence of past income tax returns and also after having considered the fact that she has a work life expectancy of ten years or more, we find the award of $20,000 is not unsupported.

Finally, Nelson's argument that there was not sufficient evidence to find it negligent is found to be meritless. Nelson was the masonry subcontractor. Mary Callan fell on masonry debris. Three of Nelson's employees worked in the area on the day of the accident and the days immediately preceding. Nelson admittedly stored masonry materials and equipment in and around "vestibule 5" before, on and after the date of the accident including cement block of the kind involved in the accident. It was alleged that Nelson was directly in charge of the activity around "vestibule 5" and was admonished on more than one occasion to clean up the "vestibule 5" area. We conclude that there was evidence sufficient to find Nelson negligent.

*By the Court.*—Judgment affirmed.